Julianna Marie Lewis
Register No. 11240-046
F.C.I. Sheridan
P.O. Box 5000
Sheridan, Oregon 97378

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| Julianna Marie Lewis,<br><br>Plaintiff,<br><br>vs.<br><br>DOCTOR ANDREW GRASSLEY; DOCTOR ZIMMERMAN; DOCTOR CYNTHIA LENNING; DOCTOR HILARY PETHEL; DOCTOR JENNIFER HUNTER; RICHARD IVES, warden FCI Sheridan; MARY M. MITCHELL, BOP Regional Director; IAN CONNORS, Administrator National Inmate Appeals.<br><br>Defendants. | Case No.: 3:18-cv-184-JR<br><br>CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) |

COMES NOW, Julianna Marie Lewis, the Plaintiff, filing in pro se and respectfully submits her Civil Rights Complaint against the above-named Defendants, Doctor Andrew Grassley, Doctor Zimmerman, Doctor Cynthia Lenning, Doctor Hilary Pethel, Doctor Jennifer Hunter, Richard Ives, warden FCI Sheridan; Mary M. Mitchell, BOP Regional Director; and Ian Connors, Administrator National Inmate Appeals. Plaintiff alleges as follows:

### Nature Of This Action

1.  Plaintiff brings this civil rights action pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1972), to seek prospective injunctive relief based upon Defendants; failure to provide Plaintiff with medically necessary surgery in violation of the Eighth Amendment of the United States Constitution, for being deliberately indifferent towards Plaintiff's serious medical and psychological health needs, and for providing medical care below the standards set forth in the United States Constitution.

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 1

## Parties

2. Plaintiff Julianna Marie Lewis is an inmate currently incarcerated in the Federal Bureau of Prisons ("BOP") at the Federal Correctional Institution located in Sheridan Oregon ("FCI Sheridan"). Plaintiff has been incarcerated since March 18, 2011 and in the custody of the BOP since November 9, 2011. Plaintiff is a transsexual woman-an individual whose gender identity is different from the male gender assigned to her at birth, who requires medical treatment to better conform her body to that gender identity. She experiences severe dysphoria and distress resulting from the incongruence between her male and physical features and her female gender identity. Plaintiff has been living as a female since she was 17 years old and began the process of receiving feminizing hormone therapy and chemical castration treatments prior to her incarceration. Plaintiff meets or exceeds all the criteria to receive sexual reassignment surgery ("SRS") yet Defendants have refused to allow Plaintiff to obtain the medically necessary surgery to further her treatment which is medically necessary for her to find congruence between her gender of birth and her gender identity as outlined in the accepted Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People.[1]

3. Upon information and belief, Defendant Doctor Andrew Grassley ("Defendant Grassley") is an employee of the BOP as a Doctor at the Federal Correctional Institution located in Sheridan, Oregon ("FCI Sheridan"). Defendant Grassley is responsible for, among other things, diagnosing and approving medical treatment for inmates' medical needs.

4. Upon information and belief, Defendant Doctor Zimmerman ("Defendant Zimmerman") is an employee of the BOP at FCI Sheridan. Defendant Zimmerman is responsible for, among other things, diagnosing and approving medical treatment for inmates' medical needs.

---

[1] *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7*
CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 2

5. Upon information and belief, Defendant Doctor Cynthia Lenning ("Defendant Lenning") is an employee of the BOP at FCI Sheridan. Defendant Lenning is responsible for, among other things, diagnosing and approving mental health treatment for inmates' mental health needs.

6. Upon information and belief, Defendant Doctor Hilary Pethel ("Defendant Pethel") is an employee of the BOP at FCI Sheridan. Defendant Pethel is responsible for, among other things, diagnosing and approving mental health treatment for inmates' mental health needs.

7. Upon information and belief, Defendant Doctor Jennifer Hunter ("Defendant Hunter") is an employee of the BOP at FCI Sheridan as a Psychologist at the Psychology department at FCI Sheridan. Defendant Hunter is responsible for, among other things, diagnosing and approving mental health treatment for inmates' mental health needs.

8. Upon information and belief, Defendant Richard Ives ("Defendant Ives") is an employee of the BOP as warden of FCI Sheridan. As warden, Defendant Ives is responsible for reviewing, and responding to the merits of Plaintiff's first round of administrative remedies and ensuring that Medical and Psychological services at FCI Sheridan were providing appropriate medical and mental health care.

9. Upon information and belief, Defendant Mary M. Mitchell, ("Defendant Mitchell") is an employee of the BOP as Regional Director. As Reginal Director Defendant Mitchell was charged with evaluating certain second level administrative remedy appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.

10. Upon information and belief, Defendant Ian Connors, ("Defendant Connors") is an employee of the BOP as Administrator National Inmate Appeals. As Administrator of the National Inmate Appeals Defendant Connors is charged with evaluating certain third level administrative remedy appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.

11. Plaintiff reserves the right, consistent with applicable rules and orders, to amend this Complaint to include other officials should it become apparent that those officials' inclusion is necessary to grant the prospective injunctive relief requested herein.

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 3

## Jurisdiction

12. This court has jurisdiction over the claims pursuant to 42 U.S.C.§§ 1331 and 1343(a)(3), and action pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1972).

## Exhaustion Of Administrative Remedies

13. Plaintiff has exhausted all required administrative remedies for her Eighth Amendment *Bivens* claim for deliberate indifference towards her serious medical and psychological needs pursuant to the BOP's Administrative Remedy Program 28 C.F.R. §§ 542.10 et seq.

## Factual Background

### I. Plaintiff's Personal History With Gender Dysphoria

14. Plaintiff was born September 22, 1987, and was raised on a farm in Southeastern Washington State. At an early age Plaintiff bonded and felt comfortable identifying with other female figures in her life. When her mother would paint her sister's fingernails and toes Plaintiff insisted that her mom paint hers as well. Throughout her childhood and adolescence Plaintiff never felt comfortable in the male gender assigned to her at birth. She attempted to hide her feminine nature while growing up to avoid the ridicule that other children gave her due to her femininity. Plaintiff's grades suffered and she began to lash out and commit acts of deviance.

15. At ten years old Plaintiff's parents bought her a computer and she came across information on transsexuals while conducting a computer search. Though it seemed taboo to her it described exactly what she was experiencing. She experienced a sense of relief because for the first time she realized she was not alone in her pain and sadness related to gender dysphoria, but she still kept this from her family for fear of ridicule.

16. In high school the combination of gender dysphoria and puberty led Plaintiff to attempt suicide by taking a bottle of 100 aspirin. She was subsequently committed to a mental health hospital for two weeks, but still fearing her family would discover her conflict with her gender of birth she failed to tell staff at the hospital that she was suffering from gender dysphoria, and isolation.

CIVIL RIGHTS COMPLAINT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 4

17. Following her release from the hospital the Plaintiff began speaking with an old friend from school named Amanda. She had a romantic relationship with Amanda and together they had a baby girl when Plaintiff was 17. Plaintiff eventually confided in Amanda about her gender dysphoria and was met with indifference. Plaintiff felt as if there was no one she could turn to and eventually she began to develop a drug addiction.

18. Plaintiff had developed an online female persona and was living a double life. At 18 her friend Christina discovered Plaintiff's double life while using her computer. Plaintiff confided in Christina and finally found someone who was willing to listen and understanding of her situation. Christina helped Plaintiff research gender dysphoria and convinced Plaintiff that the only way she would be happy is to transition from her gender of birth to her real gender. Christina helped Plaintiff come out and tell her family and friends of her gender identity. Though Plaintiff's friends were very supportive her family was not. Other than her mother, who accepted Plaintiff's gender identity from the start, her siblings and father had a hard time and were not very understanding. In spite of the animosity from her family Plaintiff finally felt happy because she no longer had to pretend to be a boy.

19. At the age of 17 Plaintiff's feelings and understandings surrounding her gender began to consolidate and Plaintiff came to understand and accept that she is a transsexual woman. She began living as a female at the age of 19 and became determined to quit her use of drugs, and finishing school. She enrolled in flight school, and completed her pilot's license. She also sought out professional help with a therapist named Peggy Peterson ("Dr. Peterson"). Plaintiff informed Dr. Peterson that ever since she had been living as her preferred gender her depression and dysphoria had decreased but that it was still present. Dr. Peterson advised Plaintiff to see a specialist in hormone therapy and gender confirmation surgery. Dr. Peterson concluded that Plaintiff's condition was consistent with the profile of a transsexual and Plaintiff was diagnosed with gender identity disorder–"the only DSM-IV diagnosis available for this condition." Subsequent to Plaintiff's initial diagnosis, the American Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity disorder" diagnosis with "gender dysphoria." The DSM-V characterizes the diagnosis of gender dysphoria as follows: "[i]ndividuals with gender dysphoria have a marked

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 5

incongruence between the gender they have been assigned to (usually at birth, referred to as natal gender) and their experienced/expressed gender." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders453(5th ed. 2013) ("DSM-V") In addition to this marked incongruence, "[t]here must also be evidence of distress about this incongruence." Id. Hereinafter this Complaint will generally refer to the condition as gender dysphoria even when referring to diagnoses prior to 2013. Dr. Peterson referred Plaintiff to Sarah Becker ("Dr. Becker"). Dr. Becker met with Plaintiff in January of 2011 where Plaintiff received the diagnosis of gender dysphoria, it was determined that it was medically necessary for Plaintiff to receive treatment for her condition that would help to bring her body into greater conformity with her gender identity. Dr. Becker prescribed Plaintiff hormones and instructed Plaintiff that after one year of hormone therapy she could be referred to a surgeon to have gender confirmation surgery, also known as sexual reassignment surgery ("SRS").

20. In an attempt to earn the money necessary to pay for her SRS Plaintiff began selling drugs. She was arrested in March of 2011, one month before she was scheduled for a follow up appointment with Dr. Becker to have her hormone dosage increased. Plaintiff was ultimately given a 15-year Federal sentence. The psychology department within the BOP acknowledged her gender dysphoria diagnosis and she has been receiving hormone therapy and is allowed to possess female undergarments, but her depression has been difficult to bare. She has attempted to remove her male genitalia twice. Since childhood Plaintiff has experienced significant distress and anxiety as a result of the discrepancy between the male sex assigned to her at birth and her own female gender identity.

21. The end goal of Plaintiff's treatment has always been to bring her primary and secondary sex characteristics into conformity with her female gender identity. The only way this can be accomplished for Plaintiff is through sex reassignment surgery ("SRS"), which involves, inter alia, reconstructing the genitalia to conform in appearance and function to that typically associated with the person's gender identity. Plaintiff's records from both Dr. Peterson, and Dr. Becker through her present treatment within the BOP reflect that she considered herself a transsexual, suffered severe distress as a result of her condition and desired to obtain a "sex change." Her medical

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 6

records consistently reflect that she was "undergoing a sex change" and in the "process" of changing her sex, with the final step of that process being SRS prior to her incarceration.

22. Upon receiving a diagnosis of gender dysphoria during her incarceration, it was determined that it was medically necessary for Plaintiff to receive treatment for her condition that would help to bring her body into greater conformity with her gender identity. Toward this end, Plaintiff was prescribed feminizing hormone therapy and injections of both Estrogen and Spironolactone to accomplish chemical castration. Plaintiff has received these treatments continually from November 9, 2011 through the present, with periodic dose adjustments as necessary. Defendant Hunter held in her Diagnostic Impression on February 10, 2016, that Plaintiff has the following symptoms when she confirmed Plaintiff's gender dysphoria diagnosis: -a marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 month's duration-a marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics-a strong desire to be rid of one's primary and/or secondary sex characteristics b/c of a marked incongruence with one's experienced/expressed gender-a strong desire for the primary and/or secondary sex characteristics of the other gender-a strong desire to be of the other gender-a strong desire to be treated as the other gender-a strong conviction that one has the typical feelings and reactions of the other gender-the condition is associated w/clinically significant distress or impairment in social, occupational, or other important areas of functioning.

23. In addition to treating the severe mental anguish Plaintiff experiences as a result of her gender dysphoria, SRS also is medically necessary so that Plaintiff may reduce the high dosages of feminizing hormones Estrogen and Spironolactone that she receives, which Defendants have repeatedly acknowledged are medically necessary treatment for Plaintiff's gender dysphoria. Large intake of these hormones over the course of many years has been attributed to increased risk for heart and vascular conditions and certain types of cancer. SRS would entirely eliminate the need for Plaintiff to take Spironolactone and would reduce by approximately 2/3 the required feminizing hormone dosage.

24. On 1/30/2017, Plaintiff's treating psychologist, Defendant Lenning, received a call from the Associate Warden of programs for FCI Sheridan, MS. Estrada, reporting Plaintiff's request for gender reassignment

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 7

surgery was being reviewed by the BOP's Central Office staff. To facilitate the transition process, it was required that Plaintiff be evaluated for consideration for a transfer to a female facility. At Ms' Estrada's request Defendant was evaluated by Defendant Lenning who determined Plaintiff was an excellent candidate for transfer to a female institution.

**II.      SRS Is Widely Recognized As Medically Necessary Treatment For Gender Dysphoria**

25.     A determination that SRS is a medically necessary treatment for Plaintiff's gender dysphoria is supported by leading medical research and standards of care. Gender dysphoria is recognized as a serious medical condition, with mental and physical manifestations. SRS has widely been accepted as genuine, necessary treatment for severe cases of gender dysphoria, including by the federal courts that have addressed the issue.

26.     Gender dysphoria is not just a mild discomfort with one's sex assigned at birth; rather, it is a profound disturbance such that the lives of some transsexual people revolve only around performing activities to lessen their gender distress. DSM-V453-454. Gender dysphoria often comes with severe mental anguish and the inability to function normally at school, at work, or in a relationship. Moreover, those suffering from gender dysphoria often become socially ostracized and stigmatized, which further diminishes self-esteem. Id. Although gender dysphoria on its own is not considered a life-threatening illness, when not properly treated, it is often associated with dangerous related conditions such as depression, substance related disorders, self-mutilation, and suicide. Id. Without treatment, the path for those suffering from gender dysphoria can be torturous, as evidenced by shockingly high suicide rates: 45 percent for those aged 18-44, in comparison to the national average of 1.6 percent, according to the 2009 National Transgender Discrimination Survey.

27.     The World Professional Association for Transgender Health ("WPATH") is a nonprofit, multidisciplinary professional association dedicated to understanding and treating gender dysphoria. The organization seeks to promote evidence-based care, education, research, advocacy, public policy, and respect for transgender health. WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"), which are based upon the best available science and expert professional consensus and articulate clinical guidance for health professionals to assist with safe and effective care

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 8

that maximizes the patients' overall health and psychological well-being. The current version of the Standards of Care—Version 7—was released in September 2011 following a five-year process in which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria. Eli Coleman et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 INT'L J. OF TRANGENDERISM, 165 (2011) ("Standards of Care"), attached hereto as Exhibit 1. WPATH's Standards of Care are the prevailing standards for treating gender dysphoria. Mental health providers and medical professionals rely heavily on the Standards of Care in determining the best course of treatment for their patients.

28. The Standards of Care make clear that SRS is an "essential and medically necessary" treatment for gender dysphoria in certain cases. Hormone therapy alone for those individuals is not sufficient. As the Standards of Care explain:

> While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria. For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity.

29. Under the Standards of Care, the criteria for vaginoplasty (surgical construction of a vagina) in male-to-female transsexuals include "[p]ersistent, well-documented gender dysphoria," "[twelve] continuous months of hormone therapy as appropriate to the patient's gender goals," and "[twelve] continuous months of living in a gender role that is congruent with their gender identity." The twelve-month requirement that an SRS candidate live in an identity-congruent gender role is "based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery." Id. It is also recommended that patients seeking SRS have regular visits with a mental health professional or other medical professional.

30. The Standards of Care apply equally to inmates and non-inmates, expressly noting that "[h]ealth care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 9

mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment and treatment as described in the SOC can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements."

31. In Oregon, both Medicaid and private health insurance plans offer coverage for health care treatment related to gender transition, including SRS.

32. Medical studies have shown the effectiveness of SRS as a treatment for gender dysphoria. Modern SRS has been practiced for more than half a century and is the internationally recognized treatment to treat gender dysphoria in transsexual persons. A thorough analysis of available research conducted in 1990 concluded that SRS is an effective treatment for gender dysphoria because it drastically reduced the distress of patients with gender dysphoria. In 2007 a review of multiple studies on SRS was conducted. Special attention was paid to the effects of SRS on gender dysphoria, sexuality, and regret. The researchers concluded that SRS is an effective treatment for gender dysphoria and the only treatment that has been evaluated empirically with large clinical case series.

33. A 2009 study aimed at evaluating the results of surgical reassignment of genital in transgender women concluded that surgical conversion of the genitalia is a safe and important phase of the treatment of transgender women.

34. In a study published in 2010 on outcomes of individuals following sex reassignment almost all patients were satisfied with the sex reassignment and 86% were assessed by clinicians at follow-up as stable or improved in global functioning.

35. Another study conducted in 2010 with 247 transgender women indicated surgical treatments are associated with improved mental health-related quality of life.

36. Nearly every study to date has concluded SRS is an effective treatment for gender dysphoria.

37. Research also has confirmed that hormone therapy alone is insufficient to treat certain cases of gender dysphoria. For example, one study compared gender dysphoria patient groups before treatment, during hormone

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 10

therapy and after SRS and showed that a bigger improvement occurs after SRS than after simply changing the gender role.

### III. Defendants Are Denying and/or Delaying Plaintiff's Medically Necessary Surgery

38. On December 5, 2016, Plaintiff filed a BOP Request for Administrative Remedy seeking SRS as a medically necessary treatment for her gender dysphoria, because the extensive feminizing hormone therapy and chemical castration treatments she had received over the course of her incarceration within the BOP have been unsuccessful in reducing the extreme distress Plaintiff suffers as a result of her gender dysphoria. Though in their responses to Plaintiff's administrative remedies, Defendants Ives, Mitchell and Inch claim she is not being denied SRS it is clear that the BOP has no intention of giving Plaintiff the medically necessary treatment, despite the explicit finding by Dr. Lenning – Plaintiff's treating mental health care professional – that Plaintiff is an excellent candidate to be transferred to a female facility following SRS. The denials of Plaintiff's various levels of administrative remedies also fail to acknowledge that SRS as medically necessary to treat Plaintiff's gender dysphoria and Plaintiff's well documented mental anguish – including anxiety and depression – resulting from being forced to retain her male genitalia.

39. The first level of Plaintiff's administrative remedy review was performed by Defendant Ives. Defendant Ives denied Plaintiff's appeal for SRS on or around December 19, 2016 despite Plaintiff's well documented case of serious gender dysphoria and the resulting mental anguish, including anxiety and depression that only SRS would effectively treat. Plaintiff's medical records make clear that Plaintiff had been living as a female and receiving feminizing hormone therapy and chemical castration treatments for over seven years but still experienced significant distress and anxiety as a result of the discrepancy between her remaining male sex characteristics, including nonfunctioning male genitalia, and her female gender identity. In fact, Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records – that Plaintiff is a "biological female" based upon her hormone levels and chemical castration, yet is being forced to live every minute of every day in a body with male genitalia that does not match her biology or deeply rooted identity. It thus was clear under

prevailing Standards of Care and medical research that SRS was medically necessary and that Plaintiff fully met the requirements for sex reassignment surgery.

40. Defendant Ives thus was fully aware that Plaintiff faces a serious medical need for SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to Plaintiff's medical need for SRS and denied her appeal. Defendant Ives failed to take any reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her gender dysphoria, which is not fully addressed by the feminizing hormone therapy and chemical castration treatments that Plaintiff has been receiving for the past 7 years. Defendant Ives's denial of Plaintiff's request for medically necessary SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history documented in her medical records and the prudent professional standards embodied by the WPATH Standards of Care.

41. Following Defendant Ives's denial of Plaintiff's request, Plaintiff appealed to the second level of review on December 27, 2017. In appealing to the second level of review, Plaintiff explained that "[r]elief from my gender dysphoria cannot be achieved without modification of my primary and/or secondary sex characteristics to establish greater congruence with my gender identity." She indicated that her suffering would be substantially relieved through SRS. Plaintiff's second level appeal was denied by Defendant Mitchell on February 16, 2017.

42. In the denial, Defendant Mitchell claims that a thorough review of Plaintiff's medical records was performed, and that she was not being denied SRS, but that at some point her case would be submitted to the Central Office for a decision. Plaintiff has received no indication that Central Office has in fact reviewed her medical records. To date the BOP's Central Office has yet to approve a single transgender inmate for SRS. Moreover, there is no indication that Plaintiff's request for SRS was ever reviewed by a health care provider with sufficient experience or knowledge regarding gender dysphoria.

42. Following Defendant Mitchell's denial of Plaintiff's request, Plaintiff appealed to the third level of review on March 5, 2017. On May 15, 2017, Defendant Connors replied to Plaintiff's final appeal and indicated that her "request for an evaluation for sex reassignment surgery was received by the Regional Office Social worker and was subsequently forwarded to the Transgender Care Committee for review." Plaintiff was informed that she would

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 12

"be advised of the decision in the near future[,]" yet she has not been informed of any decision from the Transgender Care Committee. Defendant Connors was fully informed of Plaintiff's gender dysphoria which the BOP's own Medical Management of Transgender Inmates Clinical Guidance manual describes as an individual how suffers from "significant distress or dysfunction that results from the gender incongruence[,]" and that "[w]ithout treatment, this population my experience higher rates of depression, anxiety, and suicidality."[2]

43. Regardless, even if none of Plaintiff's health care providers explicitly included in their reports a recommendation for SRS, Plaintiff's medical records make clear that Plaintiff had been living as a female and receiving feminizing hormone therapy and chemical castration treatments for over seven years but still experienced (and continues to experience) significant distress and anxiety as a result of the discrepancy between her remaining male sex characteristics, including non-functioning male genitalia, and her female gender identity and thus that SRS is medically necessary treatment for her. Defendant Connors was fully aware that Plaintiff faces a serious medical need for SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to Plaintiff's medical need for SRS when Connors denied Plaintiff's appeal. Defendant Connors failed to take any reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her gender dysphoria, which is not fully addressed by the feminizing hormone therapy and chemical castration treatments that Plaintiff has been receiving for the past seven years. Defendant Connors' denial of Plaintiff's request for medically necessary SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history documented in her medical records and the prudent professional standards embodied by the WPATH Standards of Care.

44. Despite Defendant Lenning's clear determination that Plaintiff would be an excellent canidate for transfer to a female correctional facility, no official moved to schedule or otherwise provide SRS to Plaintiff. Plaintiff therefore appealed to the third level of review on March 5, 2017.

---

[2] *Federal Bureau of Prisons, Medical Management of Transgender Inmates Clinical Guidance,* December 2016
CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 13

45. Defendant Connor's denial exhausted Plaintiff's administrative remedies within the BOP pursuant to 28 C.F.R. § 542.10 et. Seq.

46. Defendant Connors had ultimate authority to determine whether or not Plaintiff would be provided SRS and for the implementation of BOP policy with regards to medically necessary treatment. Defendant Connors has endorsed and affirmed the discriminatory and deliberately indifferent conduct of Defendants Ives and Mitchell by failing to intercede and grant Plaintiff's medically necessary SRS and by failing to ensure that BOP's policies surrounding the provision of medical treatment are implemented in a fair and non-discriminatory manner and/or that inmates with gender dysphoria are granted adequate medical care to include SRS in appropriate cases.

### Count One

#### DEFENDANTS VIOLATED PLAINTIFF'S EIGHT AMENDMENT RIGHTS RESULTING FROM THEIR FAILURE TO PROVIDE MEDICALLY NECESSARY SURGERY

47. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 46 as if fully set forth herein.

48. Plaintiff has been diagnosed with the serious medical condition of gender dysphoria which, despite 7 years of feminizing hormone therapy and chemical castration, continues to cause Plaintiff serious mental distress, and requires treatment in the form of SRS as prescribed by Plaintiff's former treating mental health providers, Dr. Peterson and Dr. Becker, and supported by prevailing medical standards of care.

49. Each Defendant-acting in his/her official capacity and under the color of federal law-was and remains deliberately indifferent to Plaintiff's medical need for SRS. Each Defendant knew of Plaintiff's serious medical need for SRS and disregarded Plaintiff's need and failed to take any reasonable measures to address Plaintiff's continued pain and suffering resulting from her gender dysphoria. The deliberate indifference of each Defendant is further demonstrated by Defendants' unreasonable reliance on their own conclusions or those of other non-specialized individuals rather than the conclusions and recommendations of a health care professional with sufficient training and/or experience in the treatment of gender dysphoria.

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 14

50.     Defendants' continued denial and/or delay of SRS is causing irreparable harm to Plaintiff, including severe anxiety and distress as a result of the discrepancy between her remaining male sex characteristics, including non-functioning male genitalia, and her female gender identity. Plaintiff's mental anguish is intensified by the fact –repeatedly established in her medical records –that Plaintiff is a "biological female" based upon her hormone levels and chemical castration, yet is being forced to live every minute of every day in a body with male genitalia that does not match her biology. The denial of SRS also unreasonably and recklessly places Plaintiff at increased risk for heart and vascular conditions and certain types of cancer, which risks could be substantially reduced as a result of the reduced hormone treatments that would be required following SRS.

51.     By failing to provide SRS to Plaintiff while incarcerated, Defendants have deprived Plaintiff of her right to medically necessary treatment guaranteed by the Eighth Amendment to the United States Constitution.

### Count Two

**DEFENDSNTS VIOLATED PLAINTIFF'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION BY DENYING OR DELAYING PLAINTIFF SRS ON THE BASIS OF HER TRANSGENDER STATUS**

52.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 51 as if fully set forth herein.

53.     The BOP Transgender Offender Manual, Program Statement 5200.04 makes no provisions for transgender inmates who have been diagnosed with gender dysphoria, and for whom SRS is medically necessary, being given authorization for SRS.

54.     This regulatory scheme discriminates against transsexual women inmates by making vaginoplasty *de facto* unavailable for such inmates. The Program Statement allows for hormone and medical treatment for inmates with gender dysphoria but provides no provisions that explicitly allow SRS for inmates even when, as here, it is medically necessary. The BOP's Clinical Guidance, Medical Management of Transgender Inmates does provide general criteria for consideration of SRS to which the Plaintiff meets all of the listed exceptions.

55.     Each of the Defendants applied the BOP's Program Statement and Clinical Guidance manual in a manner that discriminated against Plaintiff on the basis of her gender and transgender status. In considering

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 15

Plaintiff's need for SRS, each Defendant failed to giver proper consideration to the specific circumstances of Plaintiff's gender dysphoria and need for SRS, and ignored the accepted standard of care for treatment of gender dysphoria. Each Defendant regarded and applied the Program Statement as a *de facto* bar to Plainitff's request for SRS-and vaginoplasty in particular-solely as the result of Plaintiff being assigned male at birth, and a transsexual woman in particular.

56. Finally, each Defendant discriminated against Plaintiff and manifested deliberate indifference to the mental anguish and suffering still resulting from her gender dysphoria by failing to prescribe SRS and refer Plaintiff's SRS for approval by the medical authorization review committee and the health care review committee.

57. Defendants intentionally treat Plaintiff differently from non-transgender female inmates seeking vaginoplasty due to her gender and transgender status.

58. Due to the difference in treatment, similarly situated non-transgender women with serious medical needs are able to receive adequate medical care, including medically necessary vaginoplasty, but inmates assigned male at birth and transgender inmates requiring such treatment are either barred from receiving it or, at a minimum, held to a more onerous standard.

59. The difference in treatment between transgender women and non-transgender women does not further any important government interest in a way that is substantially related to that interest, nor is it rationally related to any legitimate government interest.

60. Defendants' discriminatory denial of SRS is causing irreparable harm to Plaintiff, including severe anxiety and distress as a result of the discrepancy between her remaining male sex characteristics, including non-functioning male genitalia, and her female gender identity. Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records –that Plaintiff is a "biological female" based upon her hormone levels and chemical castration, yet is being forced to live every minute of every day in a body with male genitalia that does not match her biology. The denial of SRS also unreasonably and recklessly places Plaintiff at increased risk for heart and vascular conditions and certain types of cancer, as outlined in the BOP's Clinical Guidance for Medical

Management of Transgender Inmates at page15, which risks could be substantially reduced as a result of the substantially reduced hormone treatments that would be required following SRS.

61. By failing to provide SRS to Plaintiff while incarcerated, Defendants have deprived Plaintiff of her right to equal protection under the laws guaranteed by the Fifthh Amendment to the United States Constitution.

### Prayer For Relief

WHEREFORE, Plaintiff prays for judgment against Defendants Grassley, Zimmerman, Lenning, Pethel, Hunter, Ives, Mitchell, and Connors, as follows.

62. Enter a declaratory judgment that the Defendants' actions violated Plaintiff's clearly established Eighth Amendment right to be free from cruel and unusual punishment;

63. Enter a declaratory judgment that Defendants' actions violated Plaintiff's clearly established Fifth Amendment rights under the due process and equal protection clauses.

64. Enter injunctive relief enjoining Defendants to provide Plaintiff with adequate medical care, including SRS;

65. Enter a judgment of medical and psychological indifference in the failure and delay in treating Plaintiff's gender dysphoria.

66. Award Plaintiff reasonable costs pursuant to 42 U.S.C. § 1988; and

67. Such other relief as the Court finds appropriate in the interests of justice.

Signed on this 23 day of January, 2018.

Respectfully submitted,

*Julianna Marie Lewis*
Plaintiff *In Pro Se*

CIVIL RIGHTS COMPLANT UNDER BIVENS V. SIX UNKNOWN AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1972) - 17